UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| VS. | § | Case No. H-17-514-S |
| | § | |
| | § | |
| NERVIS G. VILLALOBOS-CÁRDENAS, | § | |
| ALEJANDRO ISTÚRIZ-CHIESA, | § | |
| RAFAEL E. REITER-MUÑOZ, | § | |
| JAVIER ALVARADO-OCHOA, | § | |
| DAISY T. RAFOI-BLEULER & | § | |
| PAULO J.D.C. CASQUEIRO-MURTA | § | |

---

**DEFENDANT JAVIER ALVARADO-OCHOA'S MOTION TO DISMISS**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………………………i

TABLE OF AUTHORITIES……………………………………………………………iii

I.      INTRODUCTION……………………………………………………………...1

II.     FACTUAL BACKGROUND…………………………………………………4

        A.      Bariven's role within PDVSA…………………………………………5

        B.      PDVSA's purchasing processes, procedures, and controls………………………6

                Step 1:   Operational justification and selection of purchasing agent…………..6

                Step 2:   Preparation of vendors panel and panel recommendation form
                          ("PRF")……………………………………………………7

                Step 3:   Evaluation of bids and issuance of purchase orders……………………8

                Step 4:   Approval of invoices and payment mechanics…………………………9

        C.      Material discrepancies between PDVSA's descriptions of procedures and
                operations in the Spanish proceeding and the Government's descriptions
                in the Superseding Indictment…………………………………………………...11

        D.      The SAP System and its significance at PDVSA…………...…………………16

        E.      Alvarado's track record at PDVSA and his fall from favor…………………….....17

        F.      Alvarado's efforts to provide intelligence to the U.S. Government…………...….20

        G.      Alvarado was not part of the individual transactions identified in the
                Superseding Indictment…………………………………………………22

        H.      Priority to be accorded the Spanish proceedings……………………………....24

III.    PROCEDURAL HISTORY………………………………………………….26

IV.     LEGAL ANALYSIS…………………………………………………………28

        A.      The Court may entertain dismissal pre-arraignment…………………….……..28

                1.      Dismissing a fatally flawed indictment serves
                        judicial economy……………………………………………………28

2.      This holds for a foreign defendant challenging from overseas……....…29

3.      The "fugitive disentitlement doctrine" does not bar this motion………..30

B.      Neither the FCPA nor the MCLA extend to Alvarado…………………………32

1.      Alvarado is not a covered "person" under the FCPA……..…………33

2.      U.S.C. § 1956(h) (conspiracy to commit money laundering) and U.S.C. § 1956(a) (money laundering) are not alternative bases for prosecution……………………………………………………………34

3.      Theories of "Conspiracy," "Complicity," or "Agency" cannot resuscitate a fatally-flawed prosecution…………………………………...38

4.      Nor can a theory of agency save this prosecution………………………...40

5.      This case cannot be stretched under theories of "aiding and abetting……………………………………………………………………42

C.      Prosecution is barred by the statute of limitations…………..………….………...43

1.      The follow-up Mutual Legal Assistance Treaty ("MLAT") request and associated tolling order did not extend limitations as to Alvarado under 18 U.S.C. Section 3292…………………………...44

2.      Limitations similarly was not extended as to Count One……………….....47

V.      CONCLUSION………………………………………………………………………49

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bagwell v. Dretke*
376 F.3d 408, 410, 413 (5th Cir. 2004)……………………..…………….….…..30

*Bell v. Wolfish*
441 U.S. 520, 535 (1979)……………………………….…………………..………30

*Christiana Trust v. Riddle*
 911 F.3d 799, 803 (5th Cir. 2018)………………………………..…………..41

*Cmty. for Creative Non-Violence v. Reid*
490 U.S. 730, 739 (1989)………………………………………………..……………41

*Degen v. United States*
517 U.S. 820, 827 (1996)……………………………..……………………….30

*Empire Blue Cross & Blue Shield v. Finkelstein*
111 F.3d 278, 281 (2d Cir. 1997)…………………………………………...31

*Fed. Deposit Ins. Corp. v. Meyer*
510 U.S. 471, 476 (1994)……………………………………………………..40

*Hollingsworth v. Perry*
570 U.S. 693, 713 (2013)……………………………………………………..41

*Hughes v. Thompson*
415 U.S. 1301, 1302–03 (1974)…………………………………………….28

*In re Grand Jury Subpoenas dated Mar. 9, 2001*
179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001)……………………………………...31

*In re Hijazi*
589 F.3d 401, 403 (7th Cir. 2009)……………………………………...………29, 30

*Johnson v. Priceline.com, Inc.*
711 F.3d 271, 278–79 (2d Cir. 2013)……………………………………...41, 42

*Lloyds TSB Bank PLC*
639 F. Supp.2d 314, 321 (S.D.N.Y. 2009)……………..…………………….……37

*Meyer v. Holley*
537 U.S. 280, 286 (2003)……………………………………………..….…..41

*RJR Nabisco, Inc. v. European Cmty.*
136 S. Ct. 2090, 2100 (2016)……………………………………………..…..…37, 38

*Russell v. United States*
369 U.S. 749, 763 (1962)…………………………………………………...…………34

*Texas Food Indus. Ass'n. v. United States Dep't of Agric.*
81 F.3d 578, 581–82 (5th Cir. 1996)……………………………………………………46

*United States v. Ali*
718 F.3d 929, 939 (D.C. Cir. 2013)………………………………………...……..42

*United States v. Benavides*
2009 WL 10679152, at *2 (D. Mont. Dec. 15, 2009)…………………………….……….....48

*United States v. Burns*
162 F.3d 840, 847 (5th Cir. 1998)…………………………………………….....…34, 35

*United States v. Castle*
925 F.2d 831, 836 (5th Cir. 1991)………………………………...……….38, 39, 40, 43

*United States v. Catino*
735 F.2d 718, 722 (2d Cir. 1984)………………………………………...…………31

*United States v. Deglomini*
111 F. Supp.2d 198, 2000 (E.D.N.Y. 2000)……………………………………………..48

*United States v. Fonseca-Machado*
53 F.3d 1242, 1243–44 (11th Cir. 1995)……………………………….…………….31

*United States v. Flores*
404 F.3d 320, 324 (5th Cir. 2005)………………………………………..…………28, 29

*United States v. Fontenot*
665 F.3d 640, 644 (5th Cir. 2011)……………………………………………..…28

*United States v. Garcia*
533 F. App'x 967, 982 (11th Cir. 2013)…………………………………………37

*United States v. Garcia*
707 F. App'x 231 (5th Circ. 2017)………………………………………………………28

*United States v. Gigante*
436 F. Supp.2d 647…………………………………………………………….…..48

*United States v. Gunera*
79 F.d373, 377 (5th Cir. 2007)……………………………………………………...48

*United States v. Hawit*
No. 15-cr-252 (PKC), 2017 WL 663542, at *8 (E.D.N.Y. Feb. 17, 2017)………………………37

*United States v. Hansen*
428 F. Supp. 3d 1200, 1201–02 (D. Utah 2019)………………………………………………43

*United States v. Hill*
279 F.3d 731, 739 (9th Cir. 2002)…………………………………………………...….43

*United States v. Hoskins (Hoskins I)*
902 F.3d 69, 71 (2d Cir. 2018)…………………………………………...……33, 38, 39, 42, 43

*United States v. Hoskins (Hoskins II)*
No. 3:12-CR-238 (JBA), 2020 WL 914302, at *3 (D. Conn. Feb. 26, 2020)…………...…….41

*United States v. Jones*
542 F.2d 661, 664 (6th Cir. 1976)………………………………………...……………..29

*United States v. Kay (Kay II)*
513 F.3d 432, 447 (5th Cir. 2007)……………………………………………………41

*United States v. Khoury*
No. 4:17-MC-2553, 2018 WL 2864413, at *3 (S.D. Tex. June 11, 2018)…..………29, 30, 31, 32

*United States v. Mann*
517 F.2d 259, 266 (5th Cir. 1975)…………………………………………...…..……...34

*United States v. Meador*
138 F.3d 986, 992 (5th Cir. 1998)………………………………….…………………46

*United States v. Noriega*
683 F. Supp. 1373, 1374 (S.D. Fla. 1988)……………………………...………29, 32

*United States v. Oliveri*
190 F. Supp. 2d 933, 935 (S.D. Tex. 2001)……………………….………28, 29, 31, 32

*United States v. Panarella*
277 F.3d 678, 685 (3d Cir. 2002)…………………………………………...….………...34

*United States v. Pitt-Des Moines, Inc.*
970 F. Supp. 1346, 1349 (N.D. Ill. 1997)………………………….……………………43

*United States v. Porter*
933 F.3d 226 (3d Cir. 2019)……………………………………………..…………34

*United States v. Rincón-Fernandez*
 No. 4:15- CR-0654 (S.D. Tex. Dec. 10, 2015)……………………….……...………45

*United States v. Rogers*
389 F. Supp.3d 774, 782 (C.D. Cal. 2019)…………………………..…….…..……48

*United States v. Rogers*
781 F. Supp. 1181, 1190 (S.D. Miss. 1991)…………………………………..……49

*United States v. Santos*
553 U.S. 507, 511 (2008)……………………………………………...……………41

*United States v. Schreiber*
535 F. Supp. 1359, 1363 (S.D.N.Y. 1982)…………………………….…………..31

*United States v. Shah*
No. H-06-0428, 2007 WL 1466749, at *1 (S.D. Tex. May 15, 2007)…………………...……28

*United States v. Sharpe*
995 F.2d 49, 51 n.5 (5th Cir. 1993)…………………………………………...47

*United States v. Shortt Accountancy Corp.*
785 F.2d 1448, 1452 (9th Cir. 1986)…………………………………….…...…29

*United States v. Slochowsky*
575 F. Supp. 1562, 1567 (E.D.N.Y. 1983)………………………………..……49

*United States v. Uni Oil, Inc.*
646 F.2d 946, 953 (5th Cir. 1981)…………………………………….……...34

*United States v. Upton*
339 F. Supp.2d 190, 194 (D. Mass. 2004)……………………………………48

*United States v. Verdugo-Urquidez*
494 U.S. 259, 278 (1990)…………………………………..……………30

*United States v. Yakou*
428 F.3d 241, 252 (D.C. Cir. 2005)……………………….…………………..43

**Statutes**

15 U.S.C. § 78dd-1…………………………………………………………...…..33

15 U.S.C. § 78dd-2…………………………………………………………...……33

15 U.S.C. § 78dd-3……………………………………………………………...…33

15 U.S.C. § 78dd-3(a)…………………………………………………………...…33

18 U.S.C. § 2……………………………………………………………….…27, 28, 42

18 U.S.C. § 201……………………………………..………………………………...…40

18 U.S.C. §§ 210-215…………………………………………………………40

18 U.S.C. § 371………………………………………………………26, 27, 40

18 U.S.C. 1956……………………………………………………....1, 34, 35, 37, 38

18 U.S.C. § 1956(a)……………………………..…………………………34

18 U.S.C. § 1956(a)(1)(B)(i)………………………………………....26, 27, 34, 35

18 U.S.C. § 1956(b)(2)………………………………………..………………36

18 U.S.C. § 1956(c)(2)………………………………………………………34, 37

18 U.S.C. § 1956(c)(4)……………………………………………………34

18 U.S.C. § 1956(f)………………………………………………..……36

18 U.S.C. § 1956(f)(1)……………………………………………...………36

18 U.S.C. § 1956(h)…………………………………………….………..26, 27, 34

18 U.S.C. § 3282……………………………………………….43, 48

18 U.S.C. § 3292…………………………………………………44, 45, 46

**Rules**

Fed. R. Civ. P. 12(b)……………………………………………..……1, 28, 43

Fed. R. Crim P. 12(b)(2)……………………………………………...…………………28

**<u>Other</u>**

Black's Law Dictionary (5th ed. 1979)………………………………………………………..31

S. Rep. No. 99-433, at 14 (1986)…………………………………………….………………..38

Restatement (Third) of Agency § 1.01 cmt. f(1) (2006)…………………………………………42

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, Defendant Javier Alvarado-Ochoa ("Alvarado") moves the Court to dismiss the pending charges against him because (a) the Superseding Indictment is fatally-flawed, insufficient, contradictory, and inaccurate, and as a consequence falls short of meeting minimum constitutional due process requirements, (b) Alvarado is not within the narrow scope of foreign persons subject to prosecution under the Foreign Corrupt Practices Act, Title 15, United States Code, Sections 78dd-1, *et seq.*, as amended, (the "FCPA"), and (c) the applicable statute of limitations bars his prosecution.

The Superseding Indictment presents a tangle of alleged facts, parties, and overlapping conspiracy theories with the apparent hope that such morass will distract from the jurisdictional shortcomings in the charges against Alvarado. Rather than plainly pleading facts to support jurisdiction, the Superseding Indictment places the burden on the Court and Alvarado to make an arduous journey to try to find, and then unravel, the Government's allegations. Even after the journey's been taken, one still finds insufficient factual allegations to support jurisdiction. The factual allegations set out in the Superseding Indictment would not support jurisdiction under the Money Laundering Control Act, 18 U.S.C. § 1956, the only statute under which Alvarado is charged, even if they were proven.

## I.      INTRODUCTION

In the six-year period between 2009 and 2015, crude oil prices reached successive record highs, yielding historic revenue for Petróleos de Venezuela, S.A. ("PDVSA"), the Venezuelan national oil company. *See* Exhibit 1.[1] The surge in oil prices fueled further economic growth, which generated a demand for ever-increasing amounts of both basic and specialized materials and equipment from abroad to maintain and steadily increase oil production to meet the increased

---

[1] All references to PDVSA in this Motion to Dismiss include its subsidiaries and affiliates unless otherwise stated.

demand. PDVSA's subsidiary, Bariven, S.A. ("Bariven"), served as its agent in purchasing goods and services. Alvarado was Bariven's president for a two-year period, from 2011 to 2013. His term of service there can be distinguished from others who occupied his position, either before or after him, by his multiple attempts to blow the whistle on the corrupt practices he was witnessing.

At that time, there were two types of international vendors bidding for PDVSA contracts to generate the supply needed to meet the increased demand: (1) manufacturers of equipment or equipment components ("Manufacturers"), and (2) intermediaries acting as brokers or distributors of equipment and related components ("Intermediaries").

The two Intermediaries central to the Superseding Indictment are Roberto Enrique Rincón Fernández ("Rincón") and Abraham José Shiera Bastidas ("Shiera"). Rincón was based in Texas; Shiera was based in Florida. Each ran separate groups of companies, any number of which would bid for PDVSA contracts. At certain times, bids submitted by multiple companies, related or belonging to the same Intermediary, created the false appearance that PDVSA's bidding processes were competitive while concealing the fact that a limited group of Intermediaries who were regularly bribing Venezuelan officials was receiving systematic preferential treatment. Alleged complicity in that *modus operandi*, along with the allegation that Alvarado was also complicit in ensuring that invoices submitted to Bariven by Rincón and Shiera were placed near the front of the line for payment, appears after several readings of the Superseding Indictment, to be the sum of the web of the Government's allegations against him.

Yet, during the course of his tenure at Bariven, Alvarado only encountered Rincón and Shiera three times and in none of those instances did those encounters occur in the United States. Specifically, he encountered them: (1) at a meeting with multiple suppliers and Intermediaries held at Bariven's Caracas offices in or about October 2011, with various senior members of Bariven's

management in attendance; (2) at a meeting with other suppliers and Intermediaries held in Aruba in 2012, with various senior members of Bariven's management in attendance; and (3) at a social event in Caracas in 2012, to which Alvarado was invited and that he attended for a very brief period of less than an hour.

Rincón and Shiera, each through their respective companies, were awarded thousands of lucrative contracts, beginning, at the latest, in 2008, and totaling in aggregate more than $2 billion. Both are U.S. citizens, residing in the U.S.  The grand jury charged them in the initial Indictment with bribing Venezuelan officials both to secure contracts and to secure preferential treatment in payment of outstanding invoices. Both have pled guilty and are free on bond pending sentencing.

The preferential treatment Rincón and Shiera enjoyed from PDVSA included the following:

1.  access to inside information concerning PSVSA's forthcoming purchasing needs and procurement processes and deadlines;

2. the opportunity to serve as PDVSA's sole supplier for certain types of equipment, thereby eliminating their need to participate in competitive bidding processes;

3. the opportunity to submit multiple offers to PDVSA under the names of multiple Intermediaries, all controlled by Rincón and/or Shiera;

4. a selection process at PDVSA purportedly based on "technical" qualifications, but, in fact, based on other considerations and criteria;

5. contracting and payment processing systems headquartered outside Venezuela and operated by two PDVSA purchasing subsidiaries, PDVSA Services, Inc. in Houston, Texas ("PSI"), and PDVSA Services, B.V. in the Netherlands ("PSBV"), allowing Rincón and Shiera to circumvent Bariven and pass-by regulations, internal

procedural requirements, and legal controls, all of which were under the direction of persons familiar with actual business needs (*See* Exhibit 2); and,

6. payment terms providing, at times, for payment prior to delivery, not requiring bank guarantees, and priority-ranking of invoice payments where the underlying contract did not provide for either pre-payment or payment before an invoice was properly prepared, submitted, reviewed, and approved.

The preferential treatment accounted for compensation that was, on average, 33% higher than the market value of the equipment Rincón's and/or Shiera's Intermediary companies sold to PDVSA. As illustrated in a report Alvarado presented to PDVSA's Board of Directors in late 2011 (*See* Exhibit 3), Rincón's and Shiera's companies were awarded contracts providing for payments averaging 75% more than those awarded to Manufacturers. Moreover, the terms and conditions to which PDVSA held other suppliers were far more rigid than those to which it held typical Intermediaries, much less those of companies controlled by Rincón and/or Shiera. And unlike Rincón's and Shiera's companies, other suppliers' invoices were not processed for payment until well after the equipment had been delivered.

## II.    FACTUAL BACKGROUND

Due to the fact that there are legal proceedings underway in Spain that are substantially parallel to these proceedings, and because, at present, the Spanish proceedings are much more active than this case, the record in the Spanish legal proceedings is more fully-developed.[2] As is often the case when parallel cases are pending in different forums, there is a danger of inconsistent rulings. When those cases are pending in different countries, that danger increases exponentially.

---

[2] Pendency of the Spanish proceedings is a matter of public record.

In the Spanish case, PDVSA is identified as the complainant.[3] The case is being heard in Madrid's Central Court of Instruction No. 3 of the National Audience (in Spanish, "Juzgado Central de Instrucción no. 3 de la Audiencia Nacional"), and is centered on the same facts alleged in this case.

### A. Bariven's role within PDVSA

Wholly-owned by PDVSA, Bariven served as its purchasing agent for goods and services. It acted in that role as the *de facto* compliance department with regards to legal and regulatory requirements and formalities in the purchasing and payment processes. That is, Bariven's function was to ensure that purchases made either in Venezuela or through PDVSA's overseas affiliates were processed in compliance with Venezuelan laws and regulations, as well as PDVSA's standard internal operating procedures. *See* Exhibits 4, 4-1, 4-2, 4-3, 4-4, and 4-5.[4]

Bariven did not have discretion (a) to identify the goods and services for which PDVSA would request bids, (b) to play a substantive role in selecting a vendor, or (3) to determine the prices PDVSA would pay for those goods and services. Purchase prices, as well as payment orders, were always governed by the PDVSA end user (the "End User[s]"), which was neither affiliated with nor controlled by Bariven.

Bariven also operated in a second capacity: acting as the Venezuelan government's customs broker for importing goods purchased directly by government entities, including PDVSA and its subsidiaries. For example, in 2012, in its role as the government's customs broker, Bariven handled the importation of $1.377 billion in equipment and supporting items into Venezuela that

---

[3] In the Spanish legal system, a private entity may initiate a criminal case, which is then investigated by a judge prior to a determination by the court whether to indict.

[4] Again, the international procurement agents for PDVSA were the U.S.-based affiliate, PSI, and the Dutch-based affiliate, PSBV. Alvarado had nothing to do with either of those affiliates. The Superseding Indictment focuses on PSI's role in PDVSA's international purchasing, (*see* paragraph 2 of the Superseding Indictment), omitting the far more central role PSBV played in processing PDVSA's international purchases. PSBV had no connection with PSI, the U.S.-based affiliate.

had been purchased directly by PDVSA and its affiliates, PSI and PSBV, without Bariven's participation. *See* Exhibit 2. Included in that amount, $1.377 billion, were $325 million in goods PDVSA purchased from Rincón- and Shiera-controlled companies. Alvarado had nothing to do with those purchases. Had he been an integral part of any associated scheme alleged in the Superseding Indictment, he would have been kept in the loop through his role as president of Bariven. But those involved in the scheme alleged in the Superseding Indictment did not keep Alvarado informed of these purchases. It stretches reason beyond its bounds to think that he would have been excluded from one and included in the other. Furthermore, had he been part of any such conspiracy he would not have filed six formal written complaints about it. Indeed, PDVSA acknowledges as much in the pending Spanish proceeding.

> **B.** **PDVSA's purchasing processes, procedures, and controls**

The following paragraphs outline PDVSA's purchasing process, operational procedures, and controls for equipment purchases. They are all described in greater detail in PDVSA's filings in the Spanish legal proceedings. These documents and accounts give lie to the Government's allegations against Alvarado.

A breakdown is illustrative.  For each purchase, there was in place a defined series of steps:

> **Step 1:  Operational justification and selection of purchasing agent**

The purchasing process would commence when an End User submitted a detailed description of the equipment it needed to carry out a function for which it was responsible ("Purchase Request"), along with an explanation setting forth an operational justification for the equipment ("Operational Justification"). A more senior first-level official holding the required range of authority, based on the anticipated final price of the equipment ("NAF" in PDVSA nomenclature), reviewed the Purchase Request and Operational Justification and either approved

or rejected it. *See*, *e.g.*, Exhibit 5. When a purchase request was rejected, it would be sent back to the End User. When it was approved, a purchasing agent would be selected, either PSBV or PSI, in consultation and coordination with the End User. *See* Exhibit 5-1. Bariven's role was limited to reviewing the supporting documentation to ensure it was complete and fully compliant and to certify compliance with all required rules, regulations, laws, and procedures.

### Step 2:  Preparation of vendors panel and recommendation form ("PRF")

Step 2 consisted of preparing a "Vendors Panel," from which the final vendor would eventually be selected, as well as preparing, reviewing, and approving a Panel Recommendation Form ("PRF"), a required form prepared by PSI or PSBV, as an integral part of the Purchase Request. The Vendors Panel consisted of a list of potential bidders selected by a joint committee comprised of specialized analysts from the purchasing agent's (*i.e.*, either PSI or PSBV) and the End User's offices. Subsequently, the Bariven technical manager (at the time of Alvarado's tenure at Bariven, Mr. Gustavo Oses, and hereafter, the "Technical Manager") would then review and either approve or reject the PRF, subject to its procedural compliance. Once approved, the PRF would be logged into PDVSA's software platform, referred to as the "SAP System." To back up the electronic entry, copies of all records would be printed and placed in a physical file to document and support compliance with required procedures. *See* Exhibit 6.

Exhibit 7, an example of a PRF prepared by PSBV, shows the joint committee's selection and approval of a paired Vendors Panel and its subsequent approval by the Technical Manager at Bariven. The Technical Manager's signature confirmed the review and approval of the Vendors Panel. After the Technical Manager signed off, the PRF would have to be reviewed and signed by the appropriate Bariven compliance official, or, in certain instances, by multiple officials. If the Bariven compliance official, or, in the event there was more than one, any of the various Bariven

7

officials whose signatures were required, could not confirm the file was fully compliant and satisfactory in all respects, the official would not sign the PRF and it would be sent back to the End User and purchasing agent (PSI or PSBV) specifying all the non-compliant items.

### Step 3:  Evaluation of bids and issuance of purchase orders

Once bids from the companies appearing on a PRF were received, the End User, the purchasing agent (*i.e.,* either PSI or PSBV), and Bariven would collectively evaluate the bids. Except where a PRF related to the purchase of materials to be kept in inventory -- where the final approval rested with the Bariven official holding the appropriate level of NAF designation for the amount of the purchase -- the final approval of individual winning bids was made by the specific End User requesting the purchase order. Exhibit 8 includes a fully-documented example of the process.

It was only after the described steps and procedures were followed and documented that the assigned purchasing agent, either PSBV or PSI, could issue a Purchasing & Contracts Committee Purchasing Recommendation Form ("PPRF"), releasing the purchase order. An example is included in Exhibit 9. The PPRF had to include the complete printed file of all communications and records, including copies of the necessary forms and other documents, along with e-mail chains memorializing each successive level of approval by an official at each successive NAF level. Additionally, the SAP System required that all the key documents memorializing the complete workflow be attached to the PPRF, including e-mails, memoranda, minutes of operating committees meetings, minutes of any Board meetings, final purchase and payment terms, and required signatures from the purchasing agent's committee at either PSI or PSBV. Once the PPRF was signed at the PSI or PSBV level, as appropriate, and the file was reviewed by Bariven to ensure that the entire required process had been followed, the appropriate

8

Bariven official or officials holding the required NAF levels would sign the PPRF, to certify that it was in compliance. If any of those officials identified any irregularity, or if the PPRF was not fully compliant with applicable procedures and protocols, it would be sent back to the End User and PSI or PSBV, as appropriate, specifying what was not compliant.

### Step 4: Approval of invoices and payment mechanics

Pursuant to a standing order issued by PDVSA's Executive Committee (*See* Exhibit 10), before an invoice could be listed for processing it had to be validated, approved, and assigned a priority designation by an official representing the End User and holding the corresponding NAF level. Working in direct coordination with the End User, and as more fully described hereafter in the description of payment proposals that were submitted weekly, the process was fully-documented, managed, and consolidated by Bariven's accounts payable department. The department would create lists prioritizing approved invoices for payment taking into account various factors, including the End User's operational needs and invoice maturities.

Exhibit 10-1 shows a routine case where an accounts payable analyst sought an End User's approval of two invoices, (nos. 13681 and 13752, under purchase order 5100084398), relating to a contract that had been awarded to Venmar, Inc., a Rincón company. The End User at PDVSA was the Eastern Division Gas Compression Unit, and the General Manager of that division had approved payment. Approximately three weeks later, the accounts payable manager, working with Bariven's financial manager, grouped the two invoices with approximately 50 to 150 similarly-positioned invoices into a weekly payment proposal (hereinafter, "Weekly Payment Proposal"). The proposal was then forwarded to Bariven's president for review and signature.

Bariven's president could not modify Weekly Payment Proposals. Exhibit 11 includes two "Weekly Payment Proposals," assembled and sent in final form via email from Accounts Payable

Manager, Ángela de la Cruz, to Finance Manager, José Pirela, and then to Alvarado, at the time, Bariven's president. In reviewing Weekly Payment Proposals, Alvarado's role was limited to verifying that, in the purchasing process, all required signatures including, specifically, those of the End User approving and prioritizing each invoicve, were properly affixed in the correct sequence, and, in so doing, he was required to run through a checklist to confirm compliance with the following:

a.    that each invoice had been reviewed and approved by the End User official holding the corresponding level of NAF authority;

b.    that any invoice requiring accelerated or advance payment to continue operations had been evaluated by the responsible Accounts Payable analyst in consultation with the corresponding End User;

c.    that each invoice had been in the SAP System a minimum of thirty (30) days;

d.    that the materials or equipment invoiced had been delivered to the field; and

e.    that PDVSA had no outstanding legal dispute with the corresponding vendor.

All Weekly Payment Proposals were considered final ("definitive," as strictly translated) when the Finance Manager sent them to Bariven's President for signature. None of the invoices included in a Weekly Payment Proposal could be modified by anyone other than the End User. If at any step in the process an addition or modification to a Weekly Payment Proposal was requested, the payment proposal would have to be sent back to the End User, often resulting in delays of several weeks to prepare and process a new Weekly Payment Proposal.

In addition to Weekly Payment Proposals, PDVSA processed two other types of payment proposals: extraordinary payment proposals ("Extraordinary Payment Proposals"), and direct payment proposals ("Direct Payment Proposals"). Bariven played no role in developing

10

Extraordinary Payment Proposals, that is, it played no role in working with End Users and/or other staff in the process of selecting and coordinating with suppliers. Instead, Bariven's role was limited to verifying the legal compliance and completeness of these proposals and, where appropriate, signing such proposals to certify compliance, with Alvarado's signature. As for  Direct Payment Proposals -- used to pay invoices that had been approved and submitted for payment by PDVSA's board of directors -- these proposals were not processed or run through Bariven. Consequently, neither Alvarado, nor any one else at Bariven, was required to review or sign Direct Payment Proposals.

### C.     Material discrepancies between PDVSA's descriptions of procedures and operations in the Spanish proceedings and the Government's descriptions in the Superseding Indictment.

Within the context of a foreign political system, federal prosecutors and agents, despite their best efforts, cannot place themselves in the shoes of foreign officials administering nationalized industries. Practically any effort to do so is prone to grave error and misinterpretation. For those reasons, PDVSA's acquisition and payment procedures described by the Government in the Superseding Indictment materially vary from the actual acquisition and payment procedures PDVSA itself sets out in its sworn filings in the Spanish legal proceedings.

Alvarado is referenced only a handful of times in the Superseding Indictment. Each reference is either conclusory, unfounded and incorrect, or made out of context.

In paragraph 64 of the Superseding Indictment, for instance, the Government alleges César Rincón and Alejandro Istúriz-Chiesa ("Istúriz") were charged with "responsibility for developing and approving the payment proposals," that were "ultimately authorized by Alvarado." That is not true and, even more, is refuted again and again by thousands of documents PDVSA has filed with the Spanish court. In their respective roles, neither César Rincón nor Isturiz had the authority either

to develop or approve final payment proposals. Nor did Alvarado. That authority, in practice and in reality, was the corresponding End User's.

In the same vein, the Government fails to recognize or bring the Court's attention to the two additional modalities a vendor's invoice might have been paid: through an Extraordinary Payment Proposal or a Direct Payment Proposal. Both types of proposals would be prepared and prioritized for payment by PDVSA's Finance Director who was, amongst other things, in charge of treasury matters, and not by an official at Bariven; and both types of proposals required approval by PDVSA's Board of Directors. As previously stated, Bariven did not participate in those decisions; nor did Alvarado who, to reiterate, did not even have signature authority for Direct Payment Proposals. Once PDVSA's Board of Directors approved Extraordinary and Direct Payment Proposals, the approved invoices would be paid by the Finance and Treasury Department, with no opportunity by anyone else associated with PDVSA to intervene.

Similarly, the Government fails to appreciate or acknowledge the complexity and importance of the NAF System, as well as how it was structured and its associated procedures, including financial authorization credentials for each employee, as shown in Exhibit 22. The NAF System procedures and requirements served as critical checks and balances in the review and approval of invoices and governed the designation of an invoice's payment priority, whether in weekly, extraordinary, or direct payment proposals.

In paragraph 3 of the Superseding Indictment, the Government demonstrates a very limited understanding of PDVSA's purchasing processes. It does not recognize the extensive records system Bariven and other PDVSA subsidiaries maintained. Nor does it identify which PRF's, PPRF's, Operations Committee resolutions, invoices, e-mails, or memoranda, it contends reached

Alvarado's desk. The answer to that question would be "very few," and those few are not material to the allegations in this case, as addressed below.

Adding to the Government's lack of understanding of the process, the factual allegations in paragraph 259 of the Superseding Indictment (purporting to support Counts 15-17), are inconsistent with the sworn statements PDVSA has made in documents it has filed in the Spanish proceedings. None of the three invoices cited in paragraph 259 (purporting to support Counts 15-17) would have reached Alvarado's desk.  Each was for less than $18,640,000, the floor of Alvarado's NAF authorization range.

And two of those three would not have reached Alvarado's desk even if they had exceeded $18,640,000.  Count Fifteen references a payment that was part of an Extraordinary Payment Proposal, and Count Seventeen references a Direct Payment Proposal.  Neither would have reached Alvarado's desk because, as noted above, these types of payment proposals required the approval and payment prioritization placement by either PDVSA's Finance Director or PDVSA's Board of Directors.

An example is Exhibit 11-1, which includes a payment to Tradequip Services & Marine of $15,359,387.09, pursuant to an Extraordinary Payment Proposal. It was prepared, prioritized for payment, and approved not by Alvarado, but by PDVSA's Finance Director, Victor Aular. At Bariven, Alvarado just did not have the authority to approve Extraordinary Payment Proposals. To allege that those three payments were made by Alvarado – which they were not -- with the intention of promoting "bribery of a foreign official" by transmitting or transferring funds, or causing others to transmit or transfer funds, "from a place in the United States to a place outside the United States" is completely false.  Not only were all three payments made from a Bariven account in Portugal,

13

but Alvarado's approvals of payments at Bariven only indicated compliance with all required procedures, including, the payment approval for each invoice by the analogous End User.

There were also operational limits on Alvarado's involvement in selecting and paying vendors through PSBV in the Netherlands. When the U.S. imposed sanctions on PDVSA in 2010, (see Exhibit 24), President Chávez ordered the reduction of PSI's operations and that a new PDVSA purchasing affiliate be established in China. From then on, all large PDVSA purchases were managed by PSBV, so that any document that would have reached Alvarado's desk would have come from the PSBV in the Netherlands, rather than PSI in the U.S.

Very telling is the Government's allegation in paragraph 100 of the Superseding Indictment that Alvarado reviewed and approved a payment proposal on or about May 17, 2013. That allegation is demonstrably false. Alvarado was dismissed from Bariven several weeks earlier, on April 30, 2013, and had been suspended or removed from the SAP System the following day. It would have been impossible for him to approve anything several weeks later.

As for those proposals that did reach his desk, when a compliance issue arose relating to specific invoices, Alvarado could withhold his signature and submit the Payment Proposal to PDVSA's president, who could either confirm his decision or override him and authorize payment. Exhibits 12, 12-1, and 12-2 are copies of documents filed in the Spanish case reflecting that Alvarado did not approve several payment requests he considered non-compliant, including two requests from companies controlled by Rincón and/or Shiera. In declining to sign them, Alvarado notified PDVSA's president that he was not fully satisfied all procedures had been followed; much less did he accord Rincón and/or Shiera preferential treatment.

On July 17, 2018, through his counsel, Alvarado, provided the Government many of the documents attached to this motion explaining and elucidating those discrepancies. *See* Exhibit 21.

14

At that time, the federal prosecutors and agents assigned to this case assured Alvarado's counsel they would study them and take them into account. They did not. Instead, almost one year later, they obtained the Superseding Indictment, with curt factual assertions substantively different from PDVSA's own technically-detailed explanations of how its systems, procedures, and policies worked. By way of example, Alvarado's blocking of payments to Rincón companies included in an Extraordinary Payment Proposal, is explained in detail in the Spanish case but is omitted in its entirety from the Superseding Indictment. *See* Exhibits 12, 12-1, and 12-2.

Under the system in place at PDVSA, each tier of review was designed to ensure that all required forms were properly completed, that every official in the processing chain had placed his or her signature on the correct line, and that all necessary documents had been incorporated into the process. In summary, those were administrative functions. Ultimately, the Bariven, PSI, and PSBV officials processing and approving procedural steps and supporting documents had no discretion to override the End User who had initially requested the equipment and who, ostensibly, was in the best position to determine payment priorities.

Documents PDVSA has filed in the Spanish legal proceedings show that in PDVSA's international purchasing processes, Bariven, whether at the analyst level or the level of the president, was responsible solely for ensuring compliance with Venezuelan law and PDVSA's Contracting Manual. *See* Exhibits 4, 4-1, 4-2, 4-3, 4-4, and 4-5. Bariven approved procedures. It did not make binding purchase approvals. If someone at Bariven caught an error or omission and determined that required procedures had not been followed, the documents had to be returned to the purchasing agent, PSI or PSBV, and the End User, to be reworked or otherwise properly completed.

Therefore, when a transaction was approved by Bariven, it was merely confirmation, or validation, that the End User had secured the signature of the officer bearing the appropriate NAF level and that all required procedures and protocols had been followed. In Alvarado's case, that meant that before a document reached his desk it had been properly reviewed and that the accompanying paperwork had been signed at each appropriate level, including the Operation's Committee or PDVSA's Board of Directors, as the case may be.

**D.      The SAP System and its signifcance at PDVSA**

To coordinate and control data and record-keeping, PDVSA and its subsidiaries, including Bariven, used the SAP System, a software system developed by SAP SE. The SAP System is a software application used by large corporations throughout the world, including oil and gas companies. PDVSA's SAP System electronically tracked the procurement process from beginning to end; adherence to the system was paramount.

The SAP System and its centrality to every purchasing transaction that Bariven processed are not mentioned in the Superseding Indictment. In reading the Superseding Indictment, one is left with the mistaken impression that PDVSA's procurement process was poorly-documented, if documented at all, and that there was nothing akin to a paper trail and procedural requirements. On the contrary, the SAP System provided an electronic system of checks and balances in and of itself, supplemented by a substantial paper trail. In the Government's complete omission of this critical built-in system of checks and balances, the Superseding Indictment materially misrepresents how Bariven functioned in practice.

As indicated above, Bariven's protocols required it to maintain hard copy back-ups of all documents in the SAP System, thereby creating a duplicate, or redundant, set of files (both electronic and paper records). By law, Bariven was required to safeguard the physical records and

to request audits when it detected any deviation or non-compliance from the strict purchasing process requirements. Illustrations of Bariven requesting such audits, under direct instructions from Alvarado, are plentiful in filings in the Spanish court proceedings, and examples are included in Exhibits 13, 13-1, 14, 14-1, 14-2, 14-3, and 15.

The records included in these exhibits reflect the opposite of what the Government alleges in the Superseding Indictment. The records show that Alvarado directly intervened when he detected any irregularities. For example, he interceded and insisted on an audit of one of Rincón's companies, Ovarb, to expose the direct award PDVSA's Board of Directors issued in a non-competitive process for the purchase of a power plant priced at $252 million. In that case, Alvarado functioned as a whistle-blower. He saw that Steps 1 to 4 of the procurement process appeared, unrealistically, to have been completed in less than one month, and that PDVSA's Board of Directors had approved advance payments before the equipment had been delivered to the power plant. Taking his compliance role seriously, Alvarado intervened. In that instance, as in each instance, his actions were fully inconsistent with the role the Government alleges he played.

### E.    Alvarado's track record at PDVSA and his fall from favor

Within PDVSA, and as he rose through the ranks there, and in the Venezuelan government, prior to being appointed to Bariven, Alvarado developed a record of being a highly competent senior professional, instead of a political actor. It was that record of doing things professionally and properly that, eventually, landed him in trouble.

By way of background, in late 2009, two years before Alvarado's arrival at Bariven, large scandals erupted at PDVSA, exposing mismanagement and corruption in PDVSA's handling of blackouts and electricity rationing, including the "Pudreval affair,"[5] In reacting to the scandal,

---

[5] The PDVAL Affair, or the "Pudreval Affair," involved the discovery in 2010 of more than 130,000 tons of imported rotten food left to spoil throughout Venezuela due to corruption and mismanagement in the food distribution system.

President Hugo Chávez responded in dramatic fashion: (1) he removed Rafael Ramírez as administrator in the electricity sector and created a new Ministry of Electricity under Alí Rodríguez Araque, appointing Alvarado Deputy Minister, and (2) he ordered the imprisonment of the president and directors of two PDVSA affiliates, PDVAL and Bariven.

For Alvarado, the fit at the Ministry of Electricity was natural, given his professional and academic background. Once appointed Deputy Minister, he requested an audit, an action that was fully consistent with what he had done throughout his career when he suspected procedural non-compliance in any of the senior level positions he had held. As a result of the audit Alvarado requested, a senior executive, Luis Carlos De León ("De León"), the Director of Caracas Electricity (in Spanish, "Electricidad de Caracas"), was dismissed.

Alvarado's history of service as a compliance watchdog within various PDVSA subsidiaries and govermental entities and utility companies such as Corpoelec, is illustrated in Exhibit 16. The documents demonstrate that, over time, Alvarado ordered seven investigations and audits and, most signficantly in the instant case, that all seven involved Rincón and Shiera companies, the very companies with whom the Government claims he conspired. Those records were provided to the federal prosecutors and agents handling this case in July of 2018. They are now also part of the record in the Spanish proceedings. Notwithstanding that fact, the Superseding Indictment falsely and irresponsibly asserts that one of Alvarado's functions was "ensuring that Rincón and Shiera were not subject to any internal investigation at PDVSA." That is completely untrue.  *See* paragraph 146-e of the Superseding Indictment.

It is also worth noting that, throughout his service as president of Bariven, Alvarado was busy with multiple other obligations and positions he was then holding. Concurrently with his position as president of Bariven, Alvarado held several key positions: President of INTEVEP,

Director of PDVSA Industrial, and external member of PDVSA's Operations Committee for Exploration and Production. Prior to that, through late 2010, Alvarado had also held senior posts in the energy sector of the Chávez administration: (1) General Manager of the PDVSA Western Division, (2) Director of Carbozulia, (3) President of Electricidad de Caracas, (4) Director of CORPOELEC, (5) President of SENECA, (6) President of ENAGEN, (7) Director of EDELCA, (8) Director of CADAFE, and (9) Deputy Minister of Electricity. The last seven positions, three through nine, he held concurrently.

On June 10, 2010, in a televised address to the nation, President Chávez called out corruption at PDVSA while meeting with the members of the electrical sector's high command (referred to in Spanish as the "Estado Mayor Eléctrico"). He ordered Minister Alí Rodríguez Araque and Deputy Minister Alvarado to make a "severe" plan of "acceleration" to respond to corruption within the electrical sector. *See* Exhibit 17. In so doing, Chávez reiterated an instruction he had given his senior staff several weeks earlier at the Miraflores presidential palace. At that time, direct actions were underway that included an instruction that Alvarado dismiss De León, a key figure in the corruption scandals, as Director of Caracas Electricity. *See* Exhibit 16. One of the issues that arose at the time, as noted above, was dismay and disgust at the direct award Minister Rafael Ramírez had given Ovarb, a Rincón company, in 2010, of over $250 million. *See* Exhibits 13, 13-1, 14, 14-1, 14-2, 14-3, 15.

On October 12, 2010, Minister Alí Rodríguez Araque told Alvarado that, following orders from Chávez, he would be transferred to PDVSA, along with Chief Investigator Oswaldo González ("González"), to continue with the investigation González had been conducting jointly with the Comptroller General of the Republic. *See* Exhibit 18.

19

At that time, Alvarado was surprised to learn Chávez had appointed him to be Bariven's president. In retrospect, it may be that Chávez chose Alvarado instead of another candidate because he trusted Alvarado would take a serious look into the corruption scandal that had been plaguing Bariven. Regardless, upon his arrival at Bariven on March 21, 2011, and throughout the time he held that office (and with González's assistance), Alvarado aggressively and systematically exposed corruption, including 75% overpricing by intermediaries of Venmar, a Rincón company (*see* Exhibits 3 and 14), and continued to critically examine direct awards from PDVSA's Board of Directors to Ovarb and others linked to the dismissal of De León. *See* Exhibits 13, 13-1, 14, 14-1, 14-2, 14-3, 15 and 16.

Notwithstanding his instructions from President Chávez, Alvarado soon found himself in the midst of a power struggle between the main political figures of the Chávez administration. With González's assistance, he obtained and secured hard copy records of massive numbers of PDVSA documents. The support of President Chávez and his senior staff from which Alvarado benefited when he was initially appointed to Bariven shrunk significantly as Chávez became increasingly ill and incapacitated in the second part of 2012, dying on March 3, 2013. Shortly thereafter, on April 23, 2013, Alvarado filed his sixth internal complaint as a whistle-blower, and on April 30, 2013, he was dismissed as president of Bariven.

### F.      Alvarado's efforts to provide intelligence to the U.S. Government

As he was attempting to root out corruption, Alvarado was reporting his findings to the U.S. Embassy in Venezuela, with whom he had previously collaborated and exposed internal corruption at PDVSA. From 2010 through 2015, Alvarado participated in an intense operation with the Embassy, passing along information and documents relating to the Ministry of Electricity,

CORPOELEC, and PDVSA/Bariven, all in response to requests from the Embassy's Counselor for Economic Affairs at that time, Mr. Richard T. Yoneoka. *See* Exhibit 20.

He also assisted the U.S. Government several years later, providing information and documents to the U.S. Department of Justice in Washington, D.C., the U.S. Attorney's Office for the Southern District of New York and, as mentioned above, the U.S. Attorney's Office for the Southern District of Texas. *See* Exhibit 21. Those submissions included dozens of records relating to corruption linked to Rincón and Shiera companies.

In July of 2018, when Alvarado provided the U.S. Attorney's Office for the Southern District of Texas a representative sampling of the underlying hard copy records he had been able to preserve and simultaneously offered to meet to go over their significance, the federal prosecutors and agents initially expressed their appreciation.  But instead of taking him up on the offer, they pursued charges against him. Those charges, which are now set out in the Superseding Indictment, omit any reference to the records Alvarado provided to the Government or for that matter any indicia anyone ever looked at them. While the records and the story they tell belie the Government's narrative in this case, they are consistent with the facts rapidly coming to light in PDVSA's filings in the Spanish legal proceedings.

Official copies of the PDVSA documents Alvarado has provided to the U.S. Government include records exposing scores of illegal activities, including, but not limited to, the following:

1. direct awards by the Minister and President of PDVSA to Ovarb, a Rincón company;

2. non-compliant payments to Reliable Process & Instruments and Premiere Procurement, Rincón and Shiera companies; and

3. awards to an Intermediary, Venmar (a Rincón company), where César Rincón's role was critical.

This last point is important.  In his role at PDVSA Gas, César Rincón, alone, personally approved more than 17 purchase orders to Venmar between 2009 and 2011, totaling approximately $164.9 million and with an average overpricing of 65%. *See* Exhibit 19. Cesar Rincón's approvals of awards with overpricing to Rincón and Shiera's companies continued after he was transferred to Bariven, where he had an NAF "cap" of $18,604,000. *See* Exhibit 19-1.

Between 2012 and 2013, César Rincón continued approving inflated contracts, not only with Venmar, but with other Rincón and Shiera companies. Exhibits 19-2, 19-3, and 19-4 show mark-ups of 76.26% on awards to Tradequip Services and Marine under purchase order No. 5100096650. They also show that César Rincón approved an award of $17,323,454, overruling the End User's instruction not to allow overpricing of more than 30%. This is but one reason why, in late 2012, Alvarado sought audits of contracts awarded to Rincón's and Shiera's companies.

### G.    The bounds of Alvarado's NAF approval range

The Superseding Indictment states at paragraph 3: "Ultimately, all contracts needed to be approved by more senior PDVSA employees." That is not correct. Not all contracts needed to be approved by more senior PDVSA employees. A quick review of the documents PDVSA has filed in the Spanish proceedings reflects that as many as 1,769 contracts, amounting to approximately 71%, did not require the approval of "more senior PDVSA" employees. PPRF's were prepared and awarded at the initial NAF level. Exhibit 23 for instance shows such a PPRF, which required but one signature, the signature of a first-level official with an NAF approval level ranging from $233,000 to $2,326,000.

After the first-level official's range, there followed successive NAF approval ranges.  The upper level or "cap" of Alvarado's NAF delegated authority was $27,906,000. (*See* Exhibit 22.) The lower level or "floor" was $18,604,000.  PPRF's outside that range did not reach Alvarado's

desk.  And by the time PRF's, PPRF's, invoices, and other documents supporting purchases within that range did reach his desk, multiple lower-ranking officials had already signed them and they had been reviewed and approved by the Operations Committee.  The Operations Committee was far better equipped and informed about the operational and specific needs of the End Users.

There were only four associated with either Rincón or Shiera that would have fallen within Alvarado's approval range. For each, Alvarado's signature is the last one.  Each was presented to Alvarado only after eight (8) superintendents and managers from PSBV and Bariven had, at their respective levels of authority, had signed.  (*See* Exhibit 25.)  In each instance the End User certified that the Operations Committee had granted its approval, noting the meeting of the Operations Committee at which the payment was approved and the date, as well as its priority placement in line for payment.  More striking, all four were processed by PSBV, with whom Alvarado had no contact.  PDVSA's filings in Spain confirm that Alvarado attended only the first of four meetings at which any Rincón or Shiera company invoice was approved by the Operations Committee. After voicing his criticism at the first meetings, he was not asked back to return.  He did not attend the next three meetings on the other three proposals.

That said, Alvarado was but one of 13 members of PDVSA's Operations Committee. The Operations Committee was directly beneath PDVSA's Board of Directors.  It was the highest-level body to review and approve transactions. As a single member, Alvarado could not unilaterally make, much less dictate, any committee decisions.  Alvarado could at best only state his opinion and if he deemed it appropriate withhold his signature from a committee memorandum or resolution.  A telling example conflicting with the Government's theory in this case that Alvarado catered to Rincón or Shiera is included as Exhibit 26.  It reflects that Alvarado did not sign the

committee's approval of an award to one of Rincón's companies, Reliable Process and Instruments, thereby recording his disagreement with the award.

## H.      Priority to be accorded the Spanish proceedings

All the documents filed in the Spanish proceedings show that Alvarado was assigned to work on higher-level strategic issues for the Chávez administration. He was directly in charge of the following:

1. increasing purchases from China and, associated with that, setting operations up in PDVSA's Beijing offices;

2. creating a new purchasing affiliate in China and opening PDVSA's offices in Shanghai;

3. consolidating and expanding a Bariven affiliate in Brazil;

4. expanding PDVSA's operations in Europe through PSBV;

5. minimizing PSI operations and transferring its employees in Houston to Citgo offices; and,

6. in response to U.S. sanctions restricting PSI's activities in the U.S., to logistics, inspection services, and a limited number of procurement processes at PSI with low NAF limits that could not be done elsewhere.

The factual allegations set out in the Superseding Indictment reflect a misreading of the PDVSA system and a misunderstanding of the mechanics of Venezuela's nationalized industries. The Superseding Indictment presupposes PSI was the purchasing agent for transactions involving companies associated with Rincón or Shiera. That is incorrect. The records reflect that practically all, if not all, the transactions involving Rincón or Shiera and their companies were processed through the much larger purchasing agent, PSBV. Moreover, the PDVSA filings in Spain also

show that Alvarado did not participate in any equipment procurements involving the U.S. operations of PSI or any of its related processes.

The Superseding Indictment fails to acknowledge the parallel prosecution, which involves the same factual allegations. In the Spanish legal proceedings, PDVSA has filed a detailed description of its official purchasing processes and practices and has submitted thousands of documents outlining those processes and practices. Those include more than 2,562 purchase orders submitted to companies either Rincón or Shiera ran from 2009 to 2015, aggregating approximately $2,092,000,000.  In stark contrast, here the Government takes less than ten lines in Paragraph 3 of the Superseding Indictment to describe PDVSA's purchasing process and presents a description that is incomplete, inaccurate, contradictory, and does not, in any respect, resemble the official one.

There is no indication there has been any coordination between the proceedings in Spain and those in the United States. On information and belief, there has been none. That invites the potential for error.   As stated above, in the Spanish proceeding, Alvarado has submitted the same documents he provided the Government prosecutors and agents in 2018. *See* Exhibit 21. Upon reviewing those same documents approximately two years ago, the Office of the General Attorney in Spain and the investigating judge ordered PDVSA to submit all the documents on which it based its complaint. In response, PDVSA submitted partial records concerning awards linked to Rincón and Shiera companies and none of those submitted records required approvals from PDVSA's Operations Committee and/or Board. PDVSA withheld those documents. To date, while the documents it has submitted undermine the allegations of the Superseding Indictment, PDVSA has not complied with the Spanish court's order and remains technically in contempt. *See* Exhibits 27,

27-1, and 27-2. When and if PDVSA does fully comply, the Superseding Indictment can only be further damaged.

For now, the Court can readily rule on the issues raised in this motion because they involve solely matters of law.  That said, it is worth reiterating that, just like the case before the Spanish court, the evidence here would show only four (4) of the 2,564 PPRF's, and not a single invoice processed through Bariven between 2009 and 2015, reached Alvarado's desk. This detail is incorporated again here both to highlight the flaws in the Government's conclusory narrative and to illustrate the differences between the two systems and thereby suggest why anything remaining to this matter should be adjudicated if at all, in Spain.

### III.    <u>PROCEDURAL HISTORY</u>

The Superseding Indictment was returned April 24, 2019. Named as defendants are (1) Nervis G. Villalobos-Cárdenas ("Villalobos"); (2) Istúriz; (3) Rafael E. Reiter-Muñoz ("Reiter"); (4) Alvarado; (5) Daisy T. Rafoi-Bleuler ("Rafoi"); and (6) Paulo J.D.C. Murta ("Murta").

In Count One (1), Villalobos, Istúriz, Reiter, Alvarado, and Rafoi are charged with conspiracy to commit money laundering, in violation of the money laundering conspiracy statute, 18 U.S.C. § 1956(h). They are alleged to have conspired with each other and with De León and César Rincón.

In Count Two (2), Villalobos and Rafoi are charged under the general conspiracy statute, 18 U.S.C. § 371, with conspiracy to violate the FCPA.

In Count Three (3), Villalobos, Alvarado, and Rafoi are charged with laundering $515,513.20 on or about October 26, 2011, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and aiding and abetting in that transfer.

In Counts Four (4) through Eight (8), Istúriz is charged with five (5) instances of laundering various amounts on various dates between June and August 2012, in violation of 18 U.S.C. § 2 and § 1956(a)(1)(B)(i), and aiding and abetting in those transfers.

In Counts Nine (9) through Twelve (12), Reiter is charged with four (4) instances of laundering various amounts of money on separate dates from August 23, 2012, to May 21, 2013, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2, and aiding and abetting in those transfers.

In Count Thirteen (13), Alvarado and Murta are charged with conspiracy to commit money laundering, again in violation of the money laundering conspiracy statute, 18 U.S.C. § 1956(h). They are alleged to have conspired with each other, Villalobos, De León, Rincón, Shiera, and others.

In Count Fourteen (14), Murta is charged under the general conspiracy statute, 18 U.S.C. § 371, with conspiring with Villalobos, De León, two Banco Espíritu Santo ("BES") bankers, Rincón, and Shiera to pay bribes, in violation of the FCPA.

In Counts Fifteen (15) through Seventeen (17), Alvarado is charged with three (3) instances of laundering funds on specific dates between April 16 to July 31, 2012 from a Bariven account in Portugal to accounts controlled by three separate Rincón companies, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2, and aiding and abetting others in facilitating those transfers.

In Counts Eighteen (18) and Nineteen (19), Murta is charged with money laundering funds on March 25 and May 8, 2013, from an account controlled by Rincón to another account controlled by Rincón, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2, and aiding and abetting others in facilitating those transfers.

27

The Court has dismissed the charges against Rafoi and Murta on legal grounds not materially different from the grounds upon which Alvarado urges the Court to dismiss the charges against him. [*See* Docket Nos. 255 and 332.]

## IV.     <u>LEGAL ANALYSIS</u>

To survive the pleadings stage on any of the counts against Alvarado, the Government must satisfy the basic pleading requirements of the underlying charges. It cannot. Nor can the Government side-step those limitations by enlisting crutches such as conspiracy, agency, or "aiding and abetting." What is more, all counts are, in any event, barred by the statute of limitations.

### A.  The Court may entertain dismissal pre-arraignment

#### 1.   Dismissing a fatally-flawed indictment serves judicial economy.

Federal Rule of Criminal Procedure 12(b) authorizes the federal courts to consider by pre-trial motion "'any defense, objection, or request that the court can determine without a trial on the general issue.'" *United States v. Shah*, No. H-06-0428, 2007 WL 1466749, at *1 (S.D. Tex. May 15, 2007) (quoting Fed. R. Crim P. 12(b)(2)). "'If a question of law is involved, then consideration of the [pre-trial] motion is generally proper.'" *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005), *abrogated on other grounds by United States v. Garcia*, 707 F. App'x 231 (5th Cir. 2017)).

Appropriate pre-trial motions include pre-arraignment motions to dismiss the entire case. *See United States v. Oliveri*, 190 F. Supp. 2d 933, 935 (S.D. Tex. 2001) ("It is within the discretion of the district court to rule on the sufficiency of an indictment prior to arraignment.") (citing *Hughes v. Thompson*, 415 U.S. 1301, 1302–03 (1974)). In considering a motion to dismiss, courts are, naturally, "required to take the allegations of the indictment as true and to determine whether

an offense has been stated." *Kay I*, 359 F.3d at 742 (internal quotation marks and alterations omitted). But no question of law can be analyzed in a vacuum. Accordingly, "[a] district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Flores*, 404 F.3d at 324 n.6 (quoting *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)); *see also United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976).

### 2.  This holds for a foreign defendant challenging from overseas.

A court's discretion to examine the sufficiency of an indictment before arraignment extends to defendants outside the United States, *see Oliveri*, 190 F. Supp. 2d at 936, including, without distinction, absent foreign defendants, *see, e.g.*, *In re Hijazi*, 589 F.3d 401, 403 (7th Cir. 2009); *United States v. Khoury*, No. 4:17-MC-2553, 2018 WL 2864413, at *3 (S.D. Tex. June 11, 2018); *United States v. Noriega*, 683 F. Supp. 1373, 1374 (S.D. Fla. 1988).

In *Hijazi*, the Seventh Circuit sitting in a mandamus proceeding admonished the presiding federal district judge to rule on a motion to dismiss a Lebanese citizen living in Kuwait had filed though he had not yet appeared in the case. *In re Hijazi*, 589 F.3d at 403. The Lebanese citizen, Hijazi, was not subject to extradition. Hijazi argued that the statutes under which he had been charged in the United States could not be invoked against him as a foreign national outside the United States. *Hijazi*, 589 F.3d at 405. The Seventh Circuit agreed that this threshold question was ripe for consideration before Hijazi took it upon himself to travel voluntarily to the United States and present himself for arraignment. *Id.* at 406. The Seventh Circuit explained that as a preliminary matter the motion raised concerns about the "authority of the United States to apply its law to Hijazi's conduct." *Id.* at 403.

29

The same reasoning applies here. Alvarado is a foreign national. He challenges the Government's attempt to apply United States law to alleged conduct that -- by the Government's own admission in the Superseding Indictment -- occurred entirely outside the United States. Like Hajiri, Alvarado, who is living in Spain, should not be compelled to surrender in the United States to challenge the "threshold question" of whether he has a "duty to appear at all." *See id.* at 409.

Requiring otherwise would have the severe and fundamentally unfair effect of proceeding in criminal court against him before a determination that the prosecution is valid, much less before a conviction. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Otherwise, to exercise his right to challenge the Superseding Indictment, Alvarado would have to leave Spain, travel to the United States to surrender at a port of entry, and very likely be incarcerated in the United States pending motion practice and other pre-trial proceedings. *See Hijazi*, 589 F.3d at 409 (recognizing that a non-fugitive foreign defendant seeking a ruling on the validity of his prosecution is "simply in a different position from that of a domestic defendant seeking more ordinary relief before arraignment"); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (the dictates of the Fifth Amendment's Due Process Clause protect a foreign national defendant prosecuted in an Article III court).

### 3.  The "fugitive disentitlement doctrine" does not bar this motion.

Because Alvarado anticipates the Government may raise it here and because co-defendants have already done so, Alvarado would for a moment address the fugitive disentitlement doctrine, which "limits a criminal defendant's access to the judicial system whose authority he evades." *See Bagwell v. Dretke*, 376 F.3d 408, 410, 413 (5th Cir. 2004). Disentitlement is a "harsh sanction," *Degen v. United States*, 517 U.S. 820, 827 (1996), "sparingly used," *Khoury*, 2018 WL 2864413,

at *3. While the Fifth Circuit has not defined the term "fugitive," this Court has recognized that "[c]itizens are not fugitives by virtue of residing in another country." *Khoury*, 2018 WL 2864413, at *3 (declining to extend the fugitive disentitlement doctrine to a defendant living in a country from which he could not be extradited and who "has not absconded from custody").[6]

A "fugitive" defendant is defined as one "fleeing custody," or making clear an "intent to flee from prosecution or arrest." *See Bagwell*, 376 F.3d at 411; *Oliveri*, 190 F. Supp. 2d at 936 (quoting *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984)); *see also Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) (defining a "fugitive" as "[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." (citing Black's Law Dictionary (5th ed. 1979)).

Courts may infer an intent to flee from an individual's failure to surrender to authorities once he or she learns of pending charges, *see Oliveri*, 190 F. Supp. 2d at 936 (citing *Catino*, 735 F.2d at 722), but what amounts to "constructive flight" applies only if the defendant was in the prosecuting jurisdiction at the time of the offense. *See In re Grand Jury Subpoenas dated Mar. 9, 2001*, 179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001) ("One cannot be a fugitive [under the constructive flight principle] unless (i) he was present in the jurisdiction at the time of the alleged crime, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, and (iii) he then fails to return to the jurisdiction to face charges."); *United States v. Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed.").[7]

---

[6] *See also United States v. Fonseca-Machado*, 53 F.3d 1242, 1243–44 (11th Cir. 1995) ("Mere absence from the jurisdiction in which a crime occurred does not render a suspect a fugitive from justice.").

[7] The Government is unable to allege, as it must, that Alvarado is attempting to flee custody or prosecution.

31

The Government does not allege Alvarado was in the United States at the time of the alleged offense.[8] Alvarado does not qualify as a "fugitive" and does not change into one solely because he continues to reside outside the United States. *See Khoury*, 2018 WL 2864413, at *3.

Alvarado was born in Venezuela and spent most of his life and working career there. He is now a Spanish citizen living in Madrid. Over the years, he has visited the United States for educational and recreational purposes. The Government does not allege that Alvarado has ever conducted business in the United States, much less that he has engaged in the United States in business on behalf of any of the entities identified in the Superseding Indictment.[9] There is, thus, no suggestion he made himself absent from the United States to avoid arraignment. *See Oliveri*, 190 F. Supp. 2d at 934. On this basis alone, the charges must be dismissed for lack of jurisdiction.

### B.  Neither the FCPA nor the MCLA extend to Alvardo.

The limitations on FCPA and money laundering prosecutions recognize that despite its intentions, the United States cannot, as a matter of codified law, impose its version of "the Good" on other nations, regardless of how it might regard their policy choices and practices.  As set out below, this prosecution against Alvarado is barred because the Court lacks jurisdiction, because the Indictment fails to state a claim, and because prosecution accordingly violates due process.

---

[8] Even, assuming arguendo it did, the Government quite likely could not proceed. In *United States v. Noriega,* the court exercised its discretion to allow the defendant to attack the validity of the formal accusation and challenge the court's jurisdiction, even though the defendant was a fugitive. 683 F. Supp. At 1374. In so ruling, the court recognized the defendant's argument that the motion he wanted the court to consider "goes to the heart of the prosecution" and relied on "basic notions of due process." *Id.* at 1374-75.

[9] Alvarado did fall for a ruse and traveled to New York in 2015, earlier in the investigative stage of this case, to meet with representatives of the United States concerning several matters, including the events that are the subject of the Superseding Indictment. Alvarado was not a named defendant at the time. Nothing about his making himself available, to provide information to the Government, an act unquestionably outside the scope of either alleged conspiracy, would subject him to fugitive disentitlement.

### 1.   Alvarado is not a covered "person" under the FCPA.

As addressed below, the substantive underlying offense for all the money laundering counts

brought against Alvarado in the Superseding Indictment is an alleged violation of the FCPA. The

FCPA's scope is limited. It "define[s] precisely the categories of persons who may be charged for

violating its provisions." *United States v. Hoskins*, 902 F.3d 69, 71 (2d Cir. 2018) *(Hoskins I)*. The

FCPA "also stated clearly the extent of its extraterritorial application." *Id.*

> To that end, the FCPA provides jurisdiction over "three clear categories of persons"
>
> (1) Issuers of securities registered pursuant to 15 U.S.C. § 78*l* or required to file reports under Section 78(d), or any officer, director, employee, or agent of such issuer, or any stockholder acting on behalf of the issuer, using interstate commerce in connection with the payment of bribes, 15 U.S.C. § 78dd-1;
>
> (2) American companies and American persons using interstate commerce in connection with the payment of bribes, 15 U.S.C. § 78dd-2; and
>
> (3) foreign persons or businesses taking acts to further certain corrupt schemes, including ones causing the payment of bribes, while present in the United States. 15 U.S.C. § 78dd-3.

*Hoskins I*, 902 F.3d at 71.

Alvarado is none of these.

- He is not an "issuer of securities."

- He is not an American company or an "American person."

- He was not "present in the United States" at the time of the events alleged.

"The single, obvious omission [from the FCPA] is jurisdiction over a foreign national who

acts outside the United States, but not on behalf of an American person or company as an officer,

director, employee, agent, or stockholder." *Hoskins I*, 902 F.3d at 85. The FCPA "does not impose

liability on a foreign national who is not an agent, employee, officer, director, or shareholder of an

American issuer or domestic concern—*unless* that person commits a crime within the territory of

the United States." *Id.* at 96 (citing 15 U.S.C. § 78dd-3(a)). There is no allegation in the Superseding Indictment that Alvarado, a foreign national, committed an act within the territorial boundaries of the United States during the duration of the scheme alleged to have taken place.

### 2. U.S.C. § 1956(h) (conspiracy to commit money laundering) and U.S.C. § 1956(a) (money laundering) are not alternative bases for prosecution.

Alvarado is charged in Counts 1 and 15-17 with conspiracy to commit money laundering, and in Counts 3 and 15-17 with substantive counts of money laundering. All must be dismissed as a matter of law.[10] To state the offense of money laundering under Section 1956(a)(1)(B)(i), the Government must properly allege that the defendant: "(1) conducted or attempted to conduct a financial transaction,[11] (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity." *United States v. Burns*, 162 F.3d 840, 847 (5th Cir. 1998) (citing 18 U.S.C. § 1956(a)(1)(B)(i)). Section 1956 defines the term "conducts," to include "initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. § 1956(c)(2).

The Superseding Indictment does not allege that Alvarado conducted or attempted to conduct any financial transaction in the United States. The money laundering charges therefore

---

[10] An indictment must be dismissed if the court finds, as is the case here, that the indictment "does not 'contain[] the elements of the offense intended to be charged.'" *See United States v. Uni Oil, Inc.*, 646 F.2d 946, 953 (5th Cir. 1981) (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)); *see also United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) ("[A] charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."), *abrogation on other grounds recognized by United States v. Porter*, 933 F.3d 226 (3d Cir. 2019). "Whether the indictment sufficiently alleges a crime is an issue of law, not of fact." *United States v. Mann*, 517 F.2d 259, 266 (5th Cir. 1975). The question is whether the allegations, "taken as true," are "sufficiency[t] to charge an offense." *See id.*

[11] "Financial transaction" means "(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4).

cannot proceed. *See Burns*, 162 F.3d at 847. Count 3 charges substantive money laundering based on a $515,513.20 wire transfer from Rincón Company 2 to Swiss Account 1 on or about October 26, 2011. (Superseding Indictment ¶ 180.) Counts 15-17 charge substantive money laundering based (Count 15) on a $15,359,287.09 wire transfer from a Bariven account in Portugal to Rincón Company 2, on or about April 16, 2012; (Count 16) on a $14,611,955.00 wire transfer from a Bariven account in Portugal to Rincón Company 5, on or about May 30, 2012; and (Count 17) on a $13,220,796.20 wire transfer from a Bariven account in Portugal to Rincón Company 7, on or about July 31, 2012.

But the Superseding Indictment fails to tie Alvarado to any of those transactions. There is no allegation of Alvarado "initiating, concluding, or participating in initiating or concluding" any of the wire transfers. Not only does the Superseding Indictment not allege that Alvarado conducted or attempted to conduct any of those four transactions, but in fact, it suggests otherwise. The Superseding Indictment fails to allege Alvarado was a beneficial owner, controller, or authorized signer on any of the bank accounts allegedly used in those transactions. *See id.* ¶¶ 68–78. Nor is he alleged to have had any authority to conduct financial transactions involving those accounts. Nor is sending or receiving a wire significant to constitute an act within the territorial limits of the United States for the purposes of the FCPA. Thus, the Superseding Indictment itself belies any charge under Section 1956(a)(1)(B)(i). Moreover, the facts, to which the court admittedly need not resort, would show all four transactions were below the dollar threshold amount that would have crossed Alvarado's desk.

In enacting Section 1956, Congress limited the statute's extraterritorial reach, just as it did in the FCPA. Section 1956 provides for extraterritorial jurisdiction if and only if "(1) the conduct is by a <u>United States citizen</u> or, in the case of a non-United States citizen, the conduct [on the part

of the non-United States citizen] <u>occurs in part in the United States</u>; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.00" 18 U.S.C. § 1956(f) (emphasis added). Alvarado is not a United States citizen. Accordingly, to invoke Section 1956(f)'s limited extraterritorial jurisdiction, the Government must allege that Alvarado's "conduct occur[red] in part in the United States." *See* 18 U.S.C. § 1956(f)(1). The Government fails to make the necessary allegation.

Count 3 alleges a $515,513.20 wire from Rincón Company 2 to Swiss Account 1 on or about October 26, 2011. (Superseding Indictment ¶ 180.) Counts 15-17 involve wire transfers from accounts in Portugal -- not from the United States -- to Rincón Company 2, Rincón Company 5, and Rincón Company 7. The Superseding Indictment defines "Rincón Company 2," to include companies organized under the laws of Texas and headquartered in the Southern District of Texas *and* its Venezuelan-based affiliate. (Superseding Indictment ¶ 22.) This attempt to assert extraterritorial jurisdiction on the sole basis of a wire transfer from "Rincón Company 2," absent *any* allegation linking the transaction to the territorial United States (*see id.* ¶¶ 89, 180), falls short.[12] And with regard to all three Rincón Company accounts, there is no basis for extraterritorial jurisdiction over Alvarado because the Superseding Indictment does not allege Alvarado engaged in *any* conduct while in the United States. *See Stein*, 1994 WL 285020, at *5 ("[T]he statute requires that part of the offense conduct occur in [the United States] where the defendant is of foreign citizenship."). Alvarado did not direct those transfers, and any action by the person who did do so, including a foreign national physically present in the United States, does not create

---

[12] Because the wire transfers set out in Counts 15-17 are not alleged to have occurred in the United States, the Superseding Indictment also fails to allege a basis for personal jurisdiction over Alvarado. *See* 18 U.S.C. § 1956(b)(2) (providing for personal jurisdiction over a foreign person if, *inter alia*, the foreign person commits an offense involving "a financial transaction that occurs in whole or in part in the United States.").

jurisdiction over a foreign person not within the United States at the time, such as Alvarado. *See Lloyds TSB Bank PLC*, 639 F. Supp.2d 314, 321 (S.D.N.Y. 2009)

While some courts have considered that a defendant need not be physically present in the United States for purposes of Section 1956, in each of those cases—and unlike the wire transfer as alleged here—the defendant initiated or concluded transactions that originated or terminated in the United States. *See, e.g.*, *id.*; *United States v. Garcia*, 533 F. App'x 967, 982 (11th Cir. 2013); *United States v. Hawit*, No. 15-cr-252 (PKC), 2017 WL 663542, at *8 (E.D.N.Y. Feb. 17, 2017). Alvarado's alleged extraterritorial conduct is not "conduct occur[ing] in part in the United States" for purposes of Section 1956 because he is not alleged to have "initiat[ed], conclud[ed], or participat[ed] in initiating, or concluding" the $515,513.20, or any of the other three specified wire transfers in the first place. *See* 18 U.S.C. § 1956(c)(2).

Allowing the Government's substantive money laundering charges against Alvarado to survive the pleadings stage would upset the strict limitation Congress placed on Section 1956. The "presumption against extraterritoriality" reflects the "basic premise of our legal system that, in general, United States law governs domestically but does not rule the world." *RJR Nabisco*, 136 S. Ct. at 2100. "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (citing *Morrison*, 561 U.S. at 255). The "most notable" purpose of the presumption against extraterritoriality is to "avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *Id.*

Where "'a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.'" *RJR Nabisco*, 136 S. Ct. at 2102 (quoting *Morrison*, 561 U.S. at 265). In such cases, "[t]he scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application." *Id.* at

2101. So, while Section 1956 provides for *some* degree of extraterritorial effect, *see Stein*, 1994 WL 285020, at *4 (Section 1956 "expressly provides for limited extraterritorial jurisdiction"), one cannot assume Congress intended the statute to have even broader (but unexpressed) extraterritorial reach by covering the foreign conduct of foreign citizens where no part of the transaction is alleged to have occurred in the United States.[13]

Alvarado does not fall within the extraterritorial limits imposed on Section 1956. Including extraterritorial conduct as the Superseding Indictment purports to do is inconsistent with the language of Section 1956 and Congress's express intent. The language of Section 1956, the presumption against the extraterritorial effects of the statute, and the statute's legislative history, all compel the same conclusion that, as to Alvarado, the substantive money laundering charges fail for lack of jurisdiction.

### 3. Theories of "Conspiracy," "Complicity," or "Agency" cannot resuscitate a fatally-flawed prosecution.

The Government may not use an allegation of "conspiracy" to duck the clear statutory language. *See Hoskins I*, 902 F.3d at 71–72; *United States v. Castle*, 925 F.2d 831, 836 (5th Cir. 1991). Again, in *Hoskins I*, the Second Circuit cited the "'basic premise of our legal system that, in general, United States law governs domestically but does not rule the world.'" *See* 902 F.3d at 85 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016)). After recounting the legislative history, the Second Circuit explained:

> Congress . . . desired that the statute not overreach in its prohibitions against foreign persons. Protection of foreign nationals who may not be learned in American law is consistent with the central motivations for passing the legislation, particularly regarding foreign policy and the public perception of the United States. And the desire to protect such persons is pressing when considering the conspiracy and

---

[13] This presumption is reinforced by the statute's legislative history. The Senate Report recommending passage of the bill that eventually became the MLCA is unequivocal: "It is not the Committee's intention to impose a duty on foreign citizens operating wholly outside the United States to become aware of U.S. laws." *See* S. Rep. No. 99-433, at 14 (1986).

complicity statutes: <u>these provisions are among the broadest and most shapeless of American law and may ensnare persons with only a tenuous connection to a bribery scheme</u>.

*Id.* at 94–95. (emphasis added). As if more were necessary, the Court continued, "Congress did not intend for persons outside the statute's carefully delimited categories to be subject to conspiracy or complicity liability." *Id.* at 83–84.

*Hoskins* concerned a non-citizen accused of conspiring with a U.S. citizen and others to bribe a foreign official abroad. The Court held that one who cannot be criminally liable for violating the FCPA as a principal also cannot be prosecuted for aiding and abetting others (complicity) or conspiring to violate the FCPA. *Hoskins*, 902 F.3d at 97 ("[T]he presumption against extraterritoriality bars the government from using the conspiracy and complicity statutes [18 U.S.C. §§ 2 & 371] to charge Hoskins with any offense that is not punishable under the FCPA itself because of the statute's territorial limitations.").

Hoskins was a British citizen working for a French company in Indonesia. He and others, including some employed by a U.S. affiliate headquartered in Connecticut, allegedly bribed Indonesian government officials to secure a large contract. Money was allegedly paid out of bank accounts in the U.S. controlled by Hoskins's coconspirators. Hoskins was, admittedly, personally responsible for several acts in furtherance of the scheme abroad -- but none within the United States. *See Hoskins*, 902 F.3d at 72-73. The pertinent portion of the indictment alleged he was liable for *conspiring* with and being *complicit* with others located in the United States or who were agents of American companies. *Id.* Hoskins moved to dismiss the general conspiracy charge. The district court agreed, and the Second Circuit affirmed. *See Hoskins*, 902 F.3d at 76-98.

*Hoskins* was grounded in significant part on the Fifth Circuit's 1991 decision in *Castle*. Castle was a Canadian public official who took a bribe from a U.S. businessperson. The FCPA,

however, *excludes* the foreign public official "bribee" from liability. Thus, "the question [in *Castle* was] *whether foreign officials, who ... cannot [be prosecuted] under the FCPA itself, may be prosecuted under the general conspiracy statute for conspiring to violate the Act*." *Castle*, 925 F.2d at 832 (emphasis added). The Fifth Circuit held a foreign official *cannot* be prosecuted for conspiracy (to bribe himself) and affirmed dismissal of the indictment.

But there is more. In *Gebardi v. United States*, the Supreme Court held that where Congress affirmatively chooses to exclude a certain class of individuals from liability under a criminal statute, the Government cannot circumvent that intent by charging conspiracy to violate that statute. *See* 287 U.S. 112, 121–23 (1932). Applying the *Gebardi* principle, the Fifth Circuit in *United States v. Castle* held that foreign officials, not themselves subject to the FCPA's criminal penalties, could not be held criminally liable for conspiracy to violate the FCPA. *See* 925 F.2d at 831, 835–36. The Fifth Circuit observed that, because Congress exempted foreign officials from direct liability under the statute, it would be "absurd" to take away that exemption by permitting prosecution for conspiracy under 18 U.S.C. § 371. *Id.* at 833, 836.

The Fifth Circuit contrasted the FCPA, which by definition perhaps necessarily excludes from its reach a foreign public official who allegedly takes a bribe, with domestic bribery, codified at 18 U.S.C. §§ 201 and 210-215, and which criminalize both the payment ***and the receipt*** of a bribe by a federal official in the United States. In context, the Fifth Circuit took the time to strike this distinction from only one reason, to underscore its point that if had Congress intended to include bribe recipients as potential defendants under the FCPA, it certainly knew how to do so.

### 4.   Nor can a theory of agency save this prosecution.

The FCPA does not define the term "agent." And courts are to "construe a statutory term in accordance with its ordinary or natural meaning." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S.

471, 476 (1994); *see also United States v. Santos*, 553 U.S. 507, 511 (2008) ("When a term is undefined, we give it its ordinary meaning."); *United States v. Kay (Kay II)*, 513 F.3d 432, 447 (5th Cir. 2007). It is "well established that where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989).

So, a court must look to the ordinary or natural meaning of the word, "agent," in construing its meaning and applying the law. To determine whether an agency relationship exists, the Supreme Court has looked to the Restatement of Agency, which requires both the principal's control over the agent and "both parties' consent to the agent's acting on the principal's behalf." *Christiana Trust v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) (citing *Meyer v. Holley*, 537 U.S. 280, 286 (2003)). "'An essential element of agency is the principal's right to control the agent's actions.'" *Id.* (quoting Restatement (Third) of Agency § 1.01 cmt. f(1) (2006)). Agency, however, "requires more than mere authorization to assert a particular interest." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013).

Agency includes some significant degree of decision-making capacity. For instance, "'[t[he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.'" *Christiana Trust*, 911 F.3d at 803 (quoting Restatement (Third) of Agency § 1.01 cmt. f(1)). Thus, "[e]ven where a purported principal 'exercise[s] control' over several 'important' aspects of a transaction, no agency relationship has been established where he lacks interim control over how the purported agent performs the task 'beyond the initial specifications.'" *United States v. Hoskins (Hoskins II)*, No. 3:12-CR-238 (JBA), 2020 WL 914302, at *3 (D. Conn. Feb. 26, 2020) (quoting *Johnson v.*

41

*Priceline.com, Inc.*, 711 F.3d 271, 278–79 (2d Cir. 2013)) (Priceline.com was not an agent for customers using the service).

The Superseding Indictment does not allege Alvarado was an agent of Rincón or Shiera or any other domestic person. Rightly so, as he was not and there is no plausible argument that he was an agent of either of them. The Superseding Indictment does not allege that Alvarado engaged in *any* direct communications with or undertook *any* action at the direction of Rincón or Shiera or any U.S.-based company. The Superseding Indictment, on its face, does not allege that Alvarado was an "agent" of a domestic concern. *See Cook*, 795 F. App'x at 912 (court is not required to accept legal conclusion in a complaint as true). The Government simply cannot get there on an agency theory.

The FCPA cannot be read otherwise than to conclude that Congress intended to exempt foreign nationals who fall outside of certain designated categories clearly defined in the statute. Alvarado is not an agent of a domestic concern. Allowing the conspiracy charge to proceed against him implicates precisely the overreach that Congress intended to avoid: that the Government would use the conspiracy statute to "ensnare [foreign nationals] with only a tenuous connection to a bribery scheme." *See Hoskins I*, 902 F.3d at 95.

### 5.  This case cannot be stretched under theories of "aiding and abetting."

Title 18 U.S.C. § 2, which makes "aiding and abetting" another to commit an offense, an offense itself, is equally unavailing. The courts have repeatedly found that ancillary offenses, including conspiracy and aiding and abetting, are only deemed to confer extraterritorial jurisdiction coextensive to the offenses underlying them. *See, e.g.*, *Hoskins I*, 902 F.3d at 96 (quoting *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) ("Generally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying

criminal statute.")); *see also United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005) ("The aiding and abetting statute, however, is not so broad as to expand the extraterritorial reach of the underlying statute."); *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("[A]iding and abetting, and conspiracy . . . have been deemed to confer extraterritorial jurisdiction to the same extent as the offenses that underlie them.")[14] None of the theories, whether conspiracy, agency, or aiding and abetting, can (a) create jurisdiction, (b) create a claim where none exists, or (c) satisfy due process requirements.  Instead, dismissal is mandatory on all of these grounds. *See United States v. Castle*, 925 F.2d 831 (5th Cir. 1991), and *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018).[15]

### C.   Prosecution is barred by the statute of limitations.

Assuming, *arguendo*, the Government's allegations were otherwise sufficient both to convey jurisdiction over Alvarado and to state a claim under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, which they are not, this Court must dismiss the Superseding Indictment as to Alvarado as untimely under the five-year statute of limitations applicable to the offenses charged. *See* 18 U.S.C. § 3282. Alvarado is charged in Count One with conspiracy to commit money laundering (along with alleged co-conspirators Villalobos, Isturiz, Muñoz, and Rafoi and with the last alleged overt act on July 4, 2014). He is charged in Count Three with substantive money laundering in connection with a financial transaction occurring on or about October 26, 2012. He is

---

[14] This Court has already held that the Government's application of "agency" principles, in this case, is unconstitutionally vague (Docket Entry 255, at 22). Accepting the Government's expansion of the statutes, Alvarado, a non-resident foreign national, would not have "fair warning" that the acts alleged in this indictment would constitute a crime.

[15] Given the similarities in the language of Federal Rule of Criminal Procedure 12(b) and Federal Rule of Civil Procedure 12(b)(6), which *Iqbal* and *Cook* applied, courts have applied "essentially the same standards to both motions to dismiss civil complaints and motions to dismiss indictments." *United States v. Hansen*, 428 F. Supp. 3d 1200, 1201–02 (D. Utah 2019); *see also United States v. Pitt-Des Moines, Inc.*, 970 F. Supp. 1346, 1349 (N.D. Ill. 1997) ("A motion to dismiss an indictment is more similar to a civil Rule 12(b)(6) motion, which tests the sufficiency of the underlying complaint (here the indictment))."

charged in Count Thirteen with conspiracy to commit money laundering (along with alleged co-conspirator Murta and with the last alleged overt act on or about May 15, 2013). (Superseding Indictment ¶ 234.) And he is charged in Counts Fifteen through Seventeen with substantive counts of alleged money laundering in connection with financial transactions occurring on April 16, 2012; May 30, 2012; and July 31, 2012, respectively. These charges were brought against Alvarado on April 24, 2019.

Limitations ran on Count Three five years after October 26, 2011, that is, October 26, 2016;[16]

Limitations ran on Count Thirteen five years after May 15, 2013, that is, May 15, 2018;

Limitations ran on Count Fifteen five years after April 15, 2012, that is, April 12, 2017;

Limitations ran on Count Sixteen five years after May 30, 2012, that is, May 30, 2017;

Limitations ran on Count Seventeen five years after July 31, 2012, that is, July 31, 2017;

While limited circumstances may toll limitations or justify sealing an indictment for a limited period of time, those circumstances are absent here.

1. **The follow-up Mutual Legal Assistance Treaty ("MLAT") request and associated tolling order did not extend limitations as to Alvarado under 18 U.S.C. Section 3292.**

The government may move to suspend tolling of limitations while a request to foreign authorities for documents or records that might aid a grand jury in its determination whether there is evidence to indict a person is pending. 18 U.S.C. § 3292.[17]

On December 15, 2014, the government issued an MLAT to authorities in Switzerland seeking records from several Swiss banks. It secured a tolling order on September 21, 2015,

---

[16] Count One is addressed in further detail, *infra*, page 47.

[17] In this subsection, Alvarado in the interest of efficient judicial administration respectfully borrows language from the Court's analysis in its memorandum order of July 11, 2022. [DE 332.]

suspending pursuant to statute the "running" of the statute of limitations regarding possible crimes committed by Rincón, Shiera and their associates. *See Tolling Order*, No. 15-MC-2022 (S.D. Tex. Sept. 21, 2015).

Approximately a year later, on December 10, 2015, the government sought and a federal grand jury returned a multiple-count indictment against Rincón and Shiera for conspiracy, violations of the FCPA, and violations of the Money Laundering Control Act.[18] It is accordingly self-evident as the Court has observed [DE 332] that as of that date, the records the government had received had allowed the grand jury to identify the entities and banks that were the depositories of the alleged ill-gotten gains and met the standard necessary to return an indictment. *United States v. Rincón-Fernandez*, No. 4:15- CR-0654 (S.D. Tex. Dec. 10, 2015), [DE 1.]

The government then turned its attention to documents and records presumably located in Panama. It issued an MLAT to Panamanian authorities on March 14, 2016, requesting records for the period between January 1, 2009, and March 14, 2016. About three months later, on June 17, 2016, the government sought and obtained what it has deemed a tolling order. *See Tolling Order,* No. 16-MC-1346 (S.D. Tex. June 17, 2016). Like the Swiss MLAT, the Panamanian MLAT sought records concerning any Rincón/Shiera activities with banks through which their co-conspirators had allegedly channeled ill-gotten gains.

18 U.S.C. § 3292 provides as follows:

> (a)(1) <u>Upon application of the United States, filed before return of an</u> indictment, indicating that evidence of an offense is in a foreign country, <u>the district court before</u> <u>which a grand jury is impaneled to investigate the</u> offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. (Emphasis added.)

---

[18] Four other individuals were charged by criminal information with related offenses in November of 2015, and January of 2016, and subsequently pled guilty.

45

* * *

(b)  Except as provided in subsection (c) of this Section, a period of suspension under this Section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

(c) The total of all periods of suspension under this Section with respect to an offense—

(1)    Shall not exceed three years; and

(2)    Shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before the period would expire without regard to this Section.

As the Court previously noted, [DE 332, at p. 16], the government has taken the position that its 2015 investigation sought records specific to Rincón and Shiera, among others, concerning violations of the FCPA, the MLCA, and for conspiracy to violate these statutes. *See* [DE 222, at p. 7].  On December 10, 2015, a grand jury returned indictments against Rincón and Shiera based on, presumably among other things, the records and documents requested of Swiss authorities in the government's December 15, 2014 MLAT.  As the Court has previously concluded, [DE 332, at p. 16], the government necessarily had received the requested document as evinced by the return of an indictment by then. *Id.*

Under § 3292(b),  a tolling period is satisfied when the foreign authority takes "final action" on the MLAT request. 18 U.S.C. § 3292(b); *United States v. Meador*, 138 F.3d 986, 992 (5th Cir. 1998); *see also Texas Food Indus. Ass'n. v. United States Dep't of Agric.,* 81 F.3d 578, 581–82 (5th Cir. 1996) (a tolling order under § 3292 may toll the statute "before return of an indictment [from the] grand jury . . . impaneled to investigate the offense").  Hence, the statute of limitations tolling ended prior to December 10, 2015. [DE 332, at p. 16.]

Yet on November 7, 2016, the government issued a second MLAT to Swiss authorities seeking what it later called supplemental or additional evidence, and on January 12, 2017, the government obtained a second tolling order. [DE 332, at p.17];  *Tolling Order*, 17-MC-0094 (S.D.

46

Tex. Jan. 12, 2017). The second tolling order request was not presented to the Court that way, and the subject matter and the persons targeted are the same. [DE 332, at p. 17] As the Court has rightly concluded, the tolling order issued in relation to the 2014 MLAT did not somehow survive past December 10, 2015, when the indictment was returned. [DE 332, at p. 17]. The Swiss authorities took "final action" on the government's 2014 MLAT at some point prior to December 10, 2015.

So, as the Court has already held, [DE 332, at p. 18], the January 12, 2017, tolling order was improvidently issued. And as the Court has held, even then, it failed to toll the statute concerning co-defendant Murta, who like Alvarado was not added until the Superseding Indictment was returned April 24, 2019. [DE 332, at p. 18]. As the Court likewise noted, Section 3292 is offense-specific, not person-specific; therefore, the statutory purpose for tolling was exhausted by the 2015 Indictment. [DE 332 at p.18.]

### 2.  Limitations similarly was not extended as to Count One.

The last overt act identified in Count One (the money laundering conspiracy count against Alvarado) allegedly occurred on July 4, 2014. (Superseding Indictment ¶ 140) The Superseding Indictment was returned by the grand jury under seal on April 24, 2019, three months shy of five years, and remained *sealed* until September 4, 2019, two months after the statute of limitations had expired. Although sealing an indictment may toll limitations where circumstances warrant, there is no allegation prolonged sealing was warranted here.

The leading case is *United States v. Sharpe*, 995 F.2d 49, 51 n.5 (5th Cir. 1993) ("The government's ability to toll the statute of limitations by sealing an indictment is not unlimited."). An indictment may remain sealed beyond the limitations period only if there is a "legitimate prosecutorial objective or where the public interest otherwise requires it." *Id.* at 52. If limitations would have run before the indictment was unsealed, the indictment must be dismissed as a matter

of law, with prejudice, under 18 U.S.C. § 3282.[19] *See, e.g.*, *United States v. Gunera*, 479 F.d373, 377 (5th Cir. 2007) (requiring dismissal of an indictment that violated the statute of limitations without any analysis of prejudice or harm); *see also United States v. Benavides*, 2009 WL 10679152, at *2 (D. Mont. Dec. 15, 2009) ("An improperly sealed indictment [does not toll the limitations and] results in a violation of the statute of limitations, for which prejudice is presumed and dismissal is automatic.").

Here, the Government moved to seal the Superseding Indictment to permit the arrest of three new codefendants: Alvarado, Rafoi, Murta. (*See* Motion to Seal dated April 24, 2019, Docket Entry 131, at 1.). Rafoi was arrested in Italy on April 26, 2019. *See* Court order granting Rafoi's motion to dismiss. (Docket Entry 255, at 2). Murta was arrested in Portugal in May 2019. (*See* Docket Entry 220, at 4). And, at the Government's request to Spain resulting from the Court's Order dated April 26, 2019, requesting his extradition to the United States, Alvarado was arrested and incarcerated in Spain on May 9, 2019. He was not released until September 30, 2019, almost five months later, when the Spanish court determined that because he was under investigation in Spain in the afore-mentioned complaint filed by PDVSA.[20] Therefore, there was no excuse for the Government to keep the charges against Alvarado sealed past May of 2019.

If the Government lacks a proper purpose in sealing an indictment, the indictment is considered to be filed on the date it is unsealed. *See United States v. Upton*, 339 F. Supp.2d 190, 194 (D. Mass. 2004) ("[A]n improperly sealed indictment does not toll the statute of limitations."); *United States v. Deglomini*, 111 F. Supp.2d 198, 2000 (E.D.N.Y. 2000) ("Where the government

---

[19] *See United States v. Rogers*, 389 F. Supp.3d 774, 782 (C.D. Cal. 2019) ("Once there is no longer a legitimate prosecutorial objective served by maintaining an indictment under seal, the Government must take steps to have it unsealed."); *United States v. Gigante*, 436 F. Supp.2d 647.

[20] *See* Exhibit 28, an official document referencing the Spanish extradition proceedings of which the Court may take judicial notice.

has no legitimate purpose served by keeping the indictment sealed beyond the expiration of the limitations period, the defendants need not show prejudice, even if the indictment was properly sealed initially.").[21]

Here, limitations ran before charges were deemed to be filed as a matter of law.

## V.     CONCLUSION

Prosecuting foreign nationals indiscriminately opens up the prospect of U.S. agencies engaging in all kinds of clandestine activities, including conducting foreign sting operations. What would stop an agent from posing as a vendor in a foreign country and baiting an official into accepting a bribe? The examples are endless. The statute would then become a tool of international politics and not an instrument of justice. It would also allow an official driven or distracted by political incentives or otherwise, including personal reasons, to usurp the policy prerogatives of other agencies of Government, including the State Department and the National Security Council.

Defendant Javier Alvarado-Ochoa respectfully requests that the Court grant this motion and dismiss all counts pending against him in this case. He also requests such other and further relief to which he may be entitled.

---

[21] This limitation on prosecutorial excess is articulated elsewhere. *See United States v. Rogers*, 781 F. Supp. 1181, 1190 (S.D. Miss. 1991) ("[W]here an indictment is sealed for an improper purpose, the indictment is not 'found' until the indictment is unsealed. In that event, should the limitations period run before the unsealing, the indictment will be dismissed as time-barred."); *United States v. Slochowsky*, 575 F. Supp. 1562, 1567 (E.D.N.Y. 1983) ("If the Government cannot demonstrate . . . a prosecutorial need [for sealing the indictment beyond a certain point in time], the expiration of the statute of limitations [after the unsealing becomes unjustified] would invalidate the indictment as in any case where an indictment is untimely filed.").

Respectfully submitted,

GREGOR | WYNNE | ARNEY, PLLC

By: */s/ Michael J. Wynne*
Michael J. Wynne
Texas State Bar No. 00785289
SDTX No. 0018569
909 Fannin Street, Suite 3800
Houston, TX 77010
Telephone: (281) 450-7403
mwynne@gwafirm.com

**COUNSEL FOR JAVIER ALVARADO-OCHOA**

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served upon counsel of record on this 15ht day of September 2022 by notice of electronic filing.

By: */s/ Michael J. Wynne*
Michael J. Wynne